UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| MARGARET A. MAUGER-JAKELSKI, as Co-Personal Representative of the Estate of Elmer B. Mauger, deceased,<br><br>    Plaintiff,<br><br>    v.<br><br>METROPOLITAN LIFE INSURANCE COMPANY,<br><br>    Defendants. | Case No. 3:21-CV-190-JD-MGG |

**OPINION AND ORDER**

Plaintiff Margaret Mauger-Jakelski is co-personal representative of the estate of her late father, Elmer Mauger. In this lawsuit, she claims that, over thirty years ago, Mr. Mauger directed Defendant Metropolitan Life Insurance Company ("MetLife") to cancel his life insurance policy, which it failed to do, unbeknownst to Mr. Mauger. Instead, MetLife continued paying the premiums in the form of loans issued against the cash surrender value of the policy. By 2019, the cash surrender value became depleted to the point that the policy lapsed at which time MetLife reported to the IRS that Mr. Mauger received miscellaneous income from MetLife.

Mr. Mauger sued MetLife in this Court, claiming breach of contract for its failure to cancel the policy, insurance bad faith in its handling of Mr. Mauger's policy, and fraud for its attempts to collect the loan used to pay Mr. Mauger's policy premiums. MetLife moved to dismiss the complaint, and the Court granted the motion in part. The Court dismissed Mr. Mauger's bad faith claim with prejudice; dismissed his fraud claim with leave to amend; but refused to dismiss Mr. Mauger's breach of contract claim. (DE 21 at 13–14.)

Since then, Plaintiff has twice amended her complaint (DE 26 & 33), and MetLife has again moved to dismiss the fraud claim. This time the Court will grant the motion with prejudice.

A.    **Factual Background**

The Court starts with the facts alleged in the second amended complaint which it accepts as true at this point of the case. In 1974, Mr. Mauger took out a life insurance policy with Defendant MetLife for the benefit of his then-wife, Barbara. (DE 33 at 1–2.) One of the policy's features included the Automatic Premium Loan Option under which, if a premium is missed, the amount of the premium is automatically paid out of the policy cash value. At the insured's option, the cash value can be repaid to maintain maximum benefit. (DE 1-4 at 5, 15, & 18.) This feature ensures the policy owner that coverage does not lapse due to a temporary failure to pay premiums.

In 1985, after Mr. Mauger and Barbara were divorced, Mr. Mauger contacted MetLife to request that she be removed as the beneficiary to the policy. When MetLife informed him that the beneficiary could not be changed, Mr. Mauger instructed MetLife to cancel the policy and ceased paying premiums. (*Id.* at 2.) Yet, unbeknownst to him, MetLife failed to cancel the policy. Instead, MetLife began issuing loans against the cash surrender value of the policy in order to pay the policy premiums. The issuance of these loans continued until the cash surrender value was exhausted in April 2019. (*Id.* at 5.)

In January 2017, MetLife mailed Mr. Mauger a "Notice of Automatic Premium Loan," at which time Mr. Mauger first discovered that MetLife did not cancel the policy in 1985 as directed. (*Id.* at 4.) Around this time, Mr. Mauger learned that his policy had a cash surrender value. Mr. Mauger contacted MetLife and informed it that he had previously canceled the policy

but MetLife continued to take out additional loans. (*Id.* at 4.) In January 2018, Mr. Mauger, through his attorney, contacted MetLife and once again informed it that he canceled the policy thirty years prior, directed MetLife to stop all attempts to recover on the loans, and instructed MetLife that all communications to Mr. Mauger be made through his attorney. However, MetLife continued to contact him to attempt to collect payment on the loans for another year and a half. (*Id.* at 4–5.)

In August 2019, MetLife informed Mr. Mauger that the policy had lapsed due to non-payment of the premiums and that the outstanding policy loan was automatically repaid by a deduction from the policy's cash value. (*Id.* at 5.) MetLife asserted that repaying the loan in that manner constituted a taxable event and subsequently issued Mr. Mauger a 1099-R form in the sum of $19,875.02 for the year 2019 and reported that sum to the IRS as income. (*Id.* at 4, 8.)

As relevant to MetLife's motion to dismiss, the second amended complaint alleges that MetLife committed fraud against Mr. Mauger by issuing loans against the cash surrender value of his life insurance policy because it knew, or should have known, that Mr. Mauger had canceled the life insurance policy in 1985. MetLife then doubled down on the fraud when, instead of correcting the mistake, it attempted to collect the money for the loans from Mr. Mauger and reported to the IRS that Mr. Mauger received cash distribution from the value of the life insurance policy. Mr. Mauger claims that he incurred expenses, including attorney's fees, as a result of MetLife's fraud. In particular, he had to spend money to protect his benefits with the U.S. Department of Veterans Affairs and Medicaid and to prove to the IRS that he owed no additional income taxes as a result of MetLife issuing loans to pay the premiums.

MetLife has moved to dismiss Plaintiff's fraud claim for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).

B.  **Standard of Review**

Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal of claims for failure to state a claim upon which relief can be granted. In considering dismissal under Rule 12(b)(6), the Court construes the complaint in the light most favorable to the Plaintiff, accepts the factual allegations as true, and draws all reasonable inferences in the Plaintiff's favor. *Reynolds v. CB Sports Bar, Inc.*, 623 F.3d 1143, 1146 (7th Cir. 2010). A complaint must contain only a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). That statement must contain sufficient factual matter to "state a claim that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." *Twombly,* 550 U.S. at 545. A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but has not shown—that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 [internal quotations omitted].

C.  **Discussion**

In its motion to dismiss, MetLife argues that the second amended complaint has not cured the fraud claim deficiencies that were present in the original complaint and that the amended

fraud claim should now be dismissed with prejudice. MetLife submits that Plaintiff's fraud claim remains an impermissibly repackaged breach of contract claim as was the case in the original complaint.

In her response, Plaintiff insists that Mr. Mauger's damages under the fraud claim are distinct from the damages under the breach of contract claim. Plaintiff states that her breach of contract damages are limited to MetLife failing to pay Mr. Mauger the cash value upon his cancellation of the policy, whereas the fraud damages arise out of MetLife's subsequent conduct when it kept issuing loans against the cash value to pay the premiums and eventually reported the loans to the IRS as income to Mr. Mauger.

Indiana law requires a claimant who brings both a breach of contract and a fraud claim to prove that "(1) the breaching party committed the separate and independent tort of fraud; and (2) the fraud resulted in injury distinct from that resulting from the breach." *Galveston, LLC v. Morris Invest, LLC*, No. 1:19-CV-2676-SEB, 2020 WL 5798160 at *5 (S.D. Ind. Sept. 29, 2020) (quoting *Tobin v. Ruman*, 819 N.E.2d 78, 87 (Ct. App. Ind. 2004)). While "breaches of contract will almost invariably be regarded by the complaining party as oppressive, if not outright fraudulent," the claimant must nonetheless prove the independent tort to recover punitive damages." *Tobin*, 819 N.E.2d at 86 (quoting *Epperly v. Johnson*, 734 N.E.2d 1066, 1073 (Ind. Ct. App. 2000)). The plaintiff must demonstrate that the fraud "resulted in injury distinct from that resulting from the breach." *Tobin*, 819 N.E.2d at 87. Dismissal is appropriate where the plaintiff fails to plead a separate injury. *See Galveston, LLC,* 2020 WL 5798160 at *5 (dismissing a complaint of fraud where the fraud and breach of contract claims resulted in "identical injury"); *Fritzinger v. Angie's List, Inc.*, No. 1:12-CV-01118-JMS, 2013 WL 772864 at *2–4 (S.D. Ind. Feb. 28, 2013) (dismissing a complaint where plaintiff made "no allegation

that [the] alleged deception . . . resulted in an injury different from the injury sustained from the alleged breach of contract . . .”). This framework ensures predictability of law and reduces the costs of doing business:

> The tort remedies would duplicate the contract remedies, adding unnecessary complexity to the law. Worse, the provision of these duplicative tort remedies would undermine contract law. That law has been shaped by a tension between a policy of making the jury the normal body for resolving factual disputes and the desire of parties to contracts to be able to rely on the written word and not be exposed to the unpredictable reactions of lay factfinders to witnesses who testify that the contract means something different from what it says. Many doctrines of contract law, such as the parol evidence and "four corners" rules, are designed to limit the scope of jury trial of contract disputes (another example is the statute of frauds). Tort law does not have these screens against the vagaries of the jury.

*All-Tech Telecom, Inc. v. Amway Corp.*, 174 F.3d 862, 865–66 (7th Cir. 1999).

\* \* \* \* \*

Plaintiff's second amended complaint has not cured the problem that caused the Court to dismiss his fraud claim in the first instance.

In the original complaint, Plaintiff alleged that his damages for the breach of contract amounted to MetLife's failure to pay Mr. Mauger the cash surrender value of the policy at the time of the cancellation and his incurrence of taxes as a result of MetLife treating the loans as his income. (Compl., DE 3 at 5.) For his fraud damages Plaintiff claimed the expenses incurred to establish he "owes no income taxes . . . as a result of the repayment of the unauthorized loans" as a well as damages resulting from a need to protect his benefits with the Department of Veteran's Affairs ("VA") and Medicaid benefits. (*Id*. at 8.) In the second amended complaint, presumably to differentiate the types of damages between the breach of contract claim and the fraud claim, Plaintiff identifies the breach of contract damages as only "MetLife's failure to pay Mr. Mauger the cash surrender value" at the time Mr. Mauger directed that the policy be canceled. Unlike in the original complaint, Plaintiff does not allege as contractual damages the incurrence of taxes.

6

In relation to fraud, the second amended complaint again claims the expenses associated with establishing that Mr. Mauger owed no additional taxes and to protect his VA and Medicaid benefits. In her response to MetLife's motion to dismiss, Plaintiff further attempts to highlight the purported differences in damages by insisting that, once Mr. Mauger directed MetLife to cancel the policy, the policy was in fact canceled and, consequently, all of MetLife's subsequent conduct was independent of any contractual terms. Plaintiff makes this assertion even as the second amended complaint states that MetLife breached the contract by failing to cancel the policy, suggesting the contract was never cancelled. (Sec. Am. Compl., DE 33 at 2–3 ("Unbeknownst to Mr. Mauger, MetLife failed to cancel the life insurance policy as directed. Mr. Mauger performed all obligations required of him under the terms of life insurance policy. MetLife breached its fiduciary contractual obligation owed to Mr. Mauger by failing and refusing to honor Mr. Mauger's directions to cancel the life insurance policy.")

Plaintiff's attempt to have it both ways belies the fact that the fraud claim in the second amended complaint is premised upon the same conduct and same injury, that is, MetLife's failure to cancel the policy in 1985 and use of the policy's Automatic Premium Loan Option to pay premiums, a natural consequence of its failure to cancel the policy given the language of the contract. There is no distinct injury or separate damages for fraud, which remains a repackaged breach of contract claim.

The second amended complaint fails to plead that Mr. Mauger incurred damages as a result of MetLife's alleged fraud that were distinct from the breach of contract damages. All of the conduct Plaintiff alleges to support her fraud claim stems from MetLife's alleged failure to cancel the policy in 1985 in breach of the contract. There are no legal duties or actions independent of and outside this contractual relationship. The second amended complaint does not

allege that MetLife canceled the policy—that is, terminated its obligation to perform in case of Mr. Mauger's death—yet withheld the funds due to Mr. Mauger. Rather, Plaintiff alleges that MetLife failed to honor his directive to terminate the policy. While Plaintiff contends that MetLife issued loans against the cash value without authorization, the basis of that allegation is that MetLife breached the contract by failing to cancel the policy. The alleged wrong here is that MetLife continued to operate under the terms of the contract even though Mr. Mauger terminated the contract. The same is true with MetLife reporting Mr. Mauger's purported income to the IRS, which in turn required Mr. Mauger to expend money and efforts in dealing with the agency and to protect his VA and Medicaid benefits. Having failed to cancel the policy, MetLife's issuance of the loans is consistent with the terms of the policy and there are no unique damages that Mr. Mauger suffered outside of the breach of the contract. Even if the Court were to assume that the second amended complaint states that MetLife canceled the policy—a proposition that Plaintiff invokes in her brief but which is contrary to the allegations in the second amended complaint—MetLife's issuance of the loans, rather than paying Mr. Mauger the cash value, is a breach of contract. While Plaintiff tries to create a dichotomy between the surrender of the cash value and the issuance of the loans against the cash value, these terms are part of the same contract and are interdependent.

      In claiming that she has stated a claim for fraud that is distinct from the breach of contract, Plaintiff likens this case to *America's Directories Inc. v. Stellhorn One Hour Photo, Inc.*, 833 N.E.2d 1059 (Ind. Ct. App. 2005), but the two cases are not analogous. In *America's Directories*, a salesman for an advertising agency approached the owner of a one-hour photo development store. The salesman inquired whether the owner would like to purchase advertising in a booklet distributed in the Fort Wayne area. The owner declined, and the salesman returned

twice making the same inquiry. At the last call, after flattering the store owner with comments about his reputation in the community and alike, the salesman convinced the store owner to purchase the ads for a period of one year for a highly reduced price. However, when the time came to sign the contract, the ad agency presented three different contracts for three different years, with the prices for the years two and three being tenfold or higher. The ad agency told the store owner that it wanted to use the store's name to capitalize on its reputation and so to enhance the marketability of the advertising booklet. In return, it was willing to sell the ads at cost for the first year and to allow the store to cancel the contracts for the two subsequent years at any time. *Id.* at 1068. In addition, the ad agency told the store owner he could cancel the contracts for the second and third years at any time with a phone call although it never intended to honor such a request. In fact, its intention always was to collect the entirety of the fees even though it knew that the store was financially unable to pay for the advertising. In addition, the ad agency lied to the store owner that the contracts were essentially a formality necessary for the ad agency's "financing people" because in truth the agency had no such people. *Id*.

After the first year, the owner of the one-hour photo store attempted multiple times to cancel the two additional contracts without any response from the ad agency. Instead, he soon started receiving bills for years two and three. Thinking the bills were an oversight, he tried contacting the ad agency again, but to no avail. In fact, the agency placed its ad in the advertising booklet and kept attempting to collect the fees. The agency eventually sued and the store countered with claims of breach of contract and fraud. At trial, a jury awarded the store compensatory and punitive damages. *Id.* at 1063–65.

On appeal, the ad agency claimed, among other things, that the store's fraud claim was simply a repackaging of the breach of contract claim to allow for the recovery of punitive

9

damages. *Id*. at 1067. The court of appeals disagreed finding that in its breach of contract claim the store maintained that it obtained a right to cancel the contracts at any time whereas in its fraud claim, the store maintained that the ad agency induced it through false representations to enter into two additional contracts, even though it knew that the store could not afford to pay the large fees. *Id*. at 1068. The store believed these representations and, when the store owner decided to cancel the contracts, he spent many hours faxing, calling, and writing to the ad agency. The court of appeals found that these facts constituted "the tort of fraud independent of the breach of contract claim." *Id*.

Yet, in the instant case, there are no allegations of fraudulent inducement or any conduct constituting fraud that is outside the insurance contract which, in turn, has damages distinct from the breach of contract claim. Instead, any damages for the breach of contract and the fraud are indistinguishable because they are based on identical conduct by MetLife. While it is true that Mr. Mauger had to expend time and resources dealing with the IRS, VA, and Medicaid in order to preserve his status quo, these troubles are not independent of his contractual relationship with MetLife. "The measure of damages for breach of contract is limited by what is reasonably foreseeable at the time the parties entered into the contract." *Belle City Amusements, Inc. v. Doorway Promotions, Inc.*, 936 N.E.2d 243, 249 (Ind. Ct. App. 2010). "'Foreseeability means that which it is objectively reasonable to expect, not merely what might conceivably occur.'" *Id.* (quoting *Greives v. Greenwood*, 550 N.E.2d 334, 338 (Ind. Ct. App. 1990)). When Mr. Mauger purchased MetLife's life insurance in 1975, it was foreseeable that, if MetLife breached the contract by failing to cancel the policy at the request of Mr. Mauger and instead continued to carry on as if the contract were in effect, the damages would not be limited to just the return of the cash surrender value but would also include the expenses that Plaintiff claims Mr. Mauger

actually suffered, such as the costs of dealing with the IRS, VA, and Medicaid. If Plaintiff prevails on her breach of contract claim, MetLife will not be able to claim that these losses weren't foreseeable at the time Mr. Mauger purchased the policy. After all, MetLife issued loans to pay premiums only because it failed to cancel the policy and carried on as if all the terms were in effect. So, while in the second amended complaint Plaintiff has elected to claim the cash surrender value as her only damages for breach of contract, they are not so limited. In other words, it cannot be said that MetLife committed an independent tort which has damages that are distinct from Mr. Mauger's contractual damages.

Similarly, the Court remains unpersuaded by other cases upon which Plaintiff relies. For example, Plaintiff points to *IndyCar, LLC v. Casey*, No. 1:16-CV-1274 TWP, 2017 WL 6508875 (S.D. Ind. Dec. 20, 2017), but in that case the court found distinct damages for fraud arising out of a promoter inducing through false representations a racing outfit into entering a contract for a car race in Boston. The damages included loss of reputation and associated investigation by the state's attorney general, all of which arose independent of the contract. *Id.* at *6. Likewise, in *Marsh Supermarkets v. Marsh*, 977 F. Supp. 2d 890 (S.D. Ind. Oct. 11, 2013), a supermarket owner breached broad fiduciary duties to the company in addition to specific contract provisions. *Id*. at 897 ("First and most fundamentally, [the jury] found that 'Mr. Marsh violated his obligations to deal fairly with the company, including misrepresenting his use of the e-voucher system, the company plane, petty cash, and per diem reimbursements, [or] failing to disclose the nature of those expenses when he had an obligation to disclose.' This conduct is greater in scope than the three specific contractual obligations the jury found it violated; it sounds in an executive's broad, extra-contractual fiduciary duty to deal 'fairly, honestly, and openly with his corporation.'"). Also, "the jurors were presented with detailed evidence of the expenses the

11

Company incurred in defending an IRS audit that arose from Mr. Marsh's misconduct-expenses not necessarily encompassed within the results of Mr. Marsh's breaches of contract." *Id*. Relying on Marsh, Plaintiff in the instant case would like to believe that Mr. Mauger's subsequent involvement with the IRS, the VA, and the Medicaid automatically places his fraud claim in a category distinct from the breach of contract, but he overlooks that in *Marsh*, the IRS audit arose from misconduct "not necessarily encompassed within the results" of the contractual breach, whereas in Mr. Mauger's case, the resulting disputes with the federal agencies were the consequence of the contractual breach. Although Plaintiff is trying to disavow Mr. Mauger's troubles as the damages arising out of the breach of contract, as explained above, these damages were foreseeable when Mr. Mauger bought the life insurance policy; they are not subjective damages based upon Mr. Mauger's perceptions, feelings, or intentions. *See Greives v. Greenwood*, 550 N.E.2d 334, 338 (Ind. Ct. App. 1990) ("Foreseeability means that which it is objectively reasonable to expect, not merely what might conceivably occur."); *cf. Indiana & Michigan Elec. Co. v. Terre Haute Industries, Inc.*, 507 N.E.2d 588, 602 ("A promisor is not required to compensate the injured party for injuries which, when the contract was made, the promisor had no reason to believe would be a probable result of the breach.").

Finally, Plaintiff relies on *CoMentis, Inc. v. Purdue Research Foundation*, 765 F. Supp. 2d 1092 (N.D. Ind. Jan. 25, 2011). In that case, a chemistry professor at Purdue University, Arun Ghosh, was a consultant for a small biotechnology company, CoMentis. Pursuant to an agreement between Ghosh and CoMentis, if Ghosh developed intellectual property using CoMentis's confidential information, CoMentis had the exclusive option to license the resulting intellectual property. *Id*. at 1096. In 2009, Ghosh shared with CoMentis confidential information relating to certain chemical compounds (pyrrolidines) to be used in medical research. In sharing

the information, Ghosh misrepresented to CoMentis that he had been performing independent work on these compounds. Ghosh also applied for a patent regarding the chemical compound, which necessitated Purdue and CoMentis to negotiate a new license agreement that would cover the pyrrolidine patent application. The parties then entered into a Binding Letter of Intent which stated that they intended to make all reasonable efforts to sign a license agreement. *Id*. at 1097. As it turned out, Purdue refused to execute the final license agreement and CoMentis sued for breach of contract. Meanwhile, CoMentis learned that the patent applications were derived from confidential information it disclosed to Ghosh, contrary to his earlier representations. As a result, CoMentis amended the complaint to add a fraud claim against Ghosh.

In his motion to dismiss, Ghosh argued that CoMentis's fraud claim was a repackaged version of its breach of contract claim. The court boiled down the argument to a single issue: "whether Comentis's fraud claim alleges an *injury* that is distinct from the injury set forth in its breach of contract claim against Ghosh." *Id*. at 1107. The court found that the damages largely overlapped, except on one claim: CoMentis alleged that it was harmed by Ghosh's misrepresentation that he developed pyrrolidines independently; had he told the truth, CoMentis would not have had to negotiate a new license agreement as it would have had an exclusive license to the patents. The court found that, just like in *America's Directories*, CoMentis incurred unnecessary expenses as a result of Ghosh's misrepresentation at the time when CoMentis did not know the representations were false. *Id.* at 1108–09. Ghosh's fraudulent misrepresentations induced CoMentis to enter a new licensing agreement with Purdue on less favorable terms. *Id.* at 1108. Accordingly, the court refused to dismiss CoMentis's fraud claim.

So in *CoMentis*, both the fraudulent representations and consequential damages were encompassed outside the contractual framework. Here, however, Plaintiff has not alleged any

damages that do not naturally flow out of the breach of contract. After all, MetLife's failure to cancel Mr. Mauger's life insurance policy and the subsequent issuance of loans against the policy's cash value were part and parcel of the breach of contract with damages arising naturally from the breach. As such, Plaintiff fails to plead that any alleged fraud by MetLife resulted in "injury distinct from that resulting from the breach" of contract, and the Court thus grants MetLife's motion to dismiss the fraud count of the second amended complaint.

There's one other issue that the Court needs to address. In its response to MetLife's motion to dismiss, Plaintiff has a short section titled "Plaintiff states a claim for criminal conversion against MetLife." (Pl.s Resp. Br., DE 38 at 7–8.) In it she states that—

> . . . Plaintiff alleges that MetLife knowingly exerted unauthorized control over Mr. Mauger's property after Mr. Mauger canceled the policy in 1985, and 'without Mr. Mauger's knowledge, consent, or permission,' 'issu[ed] loans against the cash surrender value of the life insurance policy in order to pay the policy premiums.' MetLife thereby converted the cash surrender value of the policy for its own use (i.e., MetLife received premiums on a canceled policy that it was not legally entitled to receive). Plaintiff therefore states a claim for conversion against MetLife.

(*Id*. at 7–8.)

Plaintiff's assertion here is curious for multiple reasons. First, when the Court dismissed the fraud claim, it gave leave to Plaintiff to replead the fraud claim, not to add new claims. Second, the amended complaint says nothing about conversion and there's certainly nothing in Count II (the fraud claim) that should alert MetLife that it contains another claim. *See* Fed. R. Civ. P. 8(a) (requiring that a complaint "give the defendant fair notice of what the claim is and the grounds upon which it rests). And, third, in Indiana, unless the money is entrusted to another for a specific purpose but used contrary to that purpose, a simple "failure to pay a debt does not constitute criminal conversion as a matter of law." *Old Nat. Bank v. Kelly*, 31 N.E.3d 522, 532 (Ind. Ct. App. 2015) (no criminal conversion where the bank entered into a contractual

relationship with a customer to keep customer's deposits in a general account). Here, there's no allegation that Mr. Mauger entrusted MetLife with his own money for a specific purpose and outside a contractual agreement. Therefore, for all these reasons, the Court does not recognize a conversion claim in the second amended complaint.

**D.     Conclusion**

For these reasons, the Court GRANTS Defendant MetLife's motion to dismiss Plaintiff's fraud claim (DE 36).

SO ORDERED.

ENTERED: March 2, 2023

                                                /s/ JON E. DEGUILIO
                                               Chief Judge
                                               United States District Court